IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | CRIMINAL ACTION NO. 1:24-cr-00116-MLB-RDC |
| MICHAEL MACK, JR., | |
| Defendant. | |

## FINAL REPORT AND RECOMMENDATION

Defendant Michael Mack, Jr. has been charged in a four-count Indictment with possession of a firearm by a prohibited person and possession of body armor by a violent felon on two occasions: June 8, 2021, and October 25, 2023.[1] (Doc. 3). He moves to suppress evidence seized from his vehicle and statements he made during a warrantless search conducted on October 25, 2023, (Doc. 31). The undersigned held an evidentiary hearing on January 16, 2025. (R. 34). Mr. Mack filed his post-hearing brief on September 19, 2025, (Doc. 51), and the Government filed its

---

[1] Specifically, Mr. Mack has been indicted for possessing a firearm following conviction of a crime involving imprisonment exceeding one year in violation of 18 U.S.C. § 924(g)(1) in Counts One and Three. (Doc. 3). In Counts Two and Four, he has been charged with possession of body armor by a violent felon in violation of 18 U.S.C. § 931(a)(2). (*Id.* at 2-3).

response on October 24, 2025, (Doc. 52). Mr. Mack filed his reply brief on November 28, 2025, (Doc. 54).

Having fully considered the documentary and testimonial evidence, the Parties' pleadings and the applicable law, Mr. Mack's motion to suppress is ripe for judicial review.

## I.   FACTUAL BACKGROUND

The summary below is taken from the following: (1) a transcript of the evidentiary hearing[1] during which Atlanta Police Department Officer Kitwana Ruddock ("Officer Ruddock") testified, (2) a video recording (and corresponding transcript) captured by Officer Ruddock's dashboard camera, (3) a video recording (and corresponding transcript) captured by Officer Ruddock's body camera and (4) the Atlanta Police Department's ("APD") Standard Operating Procedure 4010.

On October 24, 2023, Officer Ruddock was patrolling in the city of Atlanta through an area near Piedmont and Roswell Roads. (Tr. at 9). He noticed a Dodge Charger with what appeared to be heavily tinted windows. (*Id*.). Based on his experience and knowledge of Georgia's driving regulations, he believed the tinting on the driver's and passenger's side windows was much darker than legally permitted. (Tr. at 10, 37). Because of these apparent violations, he activated his

---

[1] (Doc. 37, hereinafter "Tr.").

emergency lights and initiated a traffic stop. (Tr. at 11). The driver – later identified as Mr. Mack - slowed his vehicle in response and pulled over to the side of the road. (*Id.* at 36-37).

Before he exited his squad car, Officer Ruddock trained his spotlight on Mr. Mack's windows to determine if any light could penetrate the cabin of his car. (Tr. at 11). He also retrieved a tint meter from his trunk before approaching Mr. Mack's vehicle. (*Id*. at 12). As he stood near the driver's side door, he instructed Mr. Mack to roll down his window so that he could obtain "move visibility in the vehicle." (*Id.* at 13). He complied and began explaining that he owned a security company that hunts for fugitives and that he was currently "looking for some officers." (Ex. 51-1 at 4). Officer Ruddock noticed Mr. Mack (who was alone in the car) was wearing two protective vests – a tactical vest and body armor - with the latter displaying a gun holster containing ammunition. (Tr. at 51). The Officer explained the relevance of this equipment:

> Q. (By Mr. LaGrone): In your experience why do individuals wear body armor like this?
>
> A. (Officer Ruddock): Protection from getting into a gunfight.
>
> Q. And in your experience is this consistent with someone carrying a firearm?
>
> A. Yes.
>
> Q. And so --- okay. And how did observing Mr. Mack in this body armor change your mentality about this traffic stop?

3

> A. Well – well, I just know there's a firearm that's more than likely involved in the traffic stop. So I have to be aware of it.
>
> Q. When you say "be aware of it," are you referring to like safety?
>
> A. Yep. Yep.

(Tr. at 13; 15-16).

Officer Ruddock informed Mr. Mack that he pulled him over because his window tint appeared to be too dark and directed him to provide his driver's license. (Ex. 51-1 at 4). He claimed he didn't have it with him. (*Id*.; Tr. at 88). Officer Ruddock then asked him to provide his name and date of birth. (*Id*). After obtaining this information, he returned to his squad car to check his driving status through his computer system. (Tr. at 15, 19). He soon learned Mr. Mack's license was suspended and that there were active warrants for his arrest alleging he was a "dangerous, sexual predator." (Doc. 51-2 at 6). Officer Ruddock informed a fellow APD officer of his findings via radio. (*Id.*). He also told him Mr. Mack had "not stopped moving since I went back to my car, so. He keeps going on the passenger side, bro. Oh, boy. I'm gonna take – I'm gonna drop back a little bit." (*Id.*). For his safety, Officer Ruddock positioned his squad farther away from Mr. Mack's Charger as he awaited the information regarding Mr. Mack's criminal history and the arrival of additional officers. (*Id.*).

Before another officer arrived, Officer Ruddock returned to the Charger and

4

ordered Mr. Mack to step out. (Doc. 51-1 at 6-7). He noticed Mr. Mack had removed the vests he had been wearing. (Tr. at 54). As he was informed that he was being detained, Mr. Mack explained that his wife was listening to their conversation on his cellphone and that he didn't know "what you all got going on, but I know I ain't got no warrants or nothing like that." (Doc. 51-1 at 8). Officer Ruddock asked if he had any weapons in his possession. (*Id.*). He said, "No, I ain't got no firearms." (*Id.*). The Officer then informed him that he was being detained because his license was suspended. (*Id.* at 9). He told Mr. Mack's wife – Donna Everett – that she could retrieve the Charger if she arrived before it was towed away by a wrecker service. (*Id.* at 10-11; 14).

After Mr. Mack was handcuffed and secured in the back seat of the squad car, Officer Ruddock returned to the Charger and began searching near the driver's side area. (Tr. at 35-36). He allowed Mr. Mack, who was still speaking with his wife, to maintain possession of his cellphone. (*Id.*). The Officer testified that he was "doing an inventory of the vehicle and [] conducting my investigation." (*Id.* at 34). During the search, he found a firearm and ammunition under the driver's seat but didn't seize them because "[t]he situation didn't dictate it. I needed to get my latex -- my gloves for collecting valuables." (*Id.*).

While Officer Ruddock was searching the Charger, Mr. Mack continually talked with his wife. (Doc. 51-2 at 10-14; 17-23; 37-38). He told her the Officer was "all

up under the car seeing all that stuff there. Yeah, so, they telling me wasn't my gun and that's it. I don't see why he can't give me no ticket." (Doc. 51-2 at 11).

When Officer Ruddock returned to his squad car, he informed Mr. Mack he was being arrested for driving with a suspended license. (Tr. at 11). He also explained that he would be booked into jail because "in the State of Georgia, if you have a suspended license, that's automatic – that's automatic like city jail." (Doc. 51-2 at 12). He then asked Mr. Mack if he had any weapons in his car. (*Id.*). He replied: "That's my wife's -- see, that's my wife's car. She just had dropped it off to me, you know what I mean?" (*Id.*). He claimed that "all that stuff [] hers," and asked the Officer to issue a ticket instead. (*Id.* at 12). Officer Ruddock repeated that he had to be taken into custody because "whenever you're driving without a valid license, you have to go talk to the judge directly." (*Id.* at 13). Ms. Everett, who was privy to this entire exchange, stated that she was on her way but was uncertain of their exact location. (*Id.*).

Approximately twenty-two minutes after initiation of the traffic stop, Officer Ruddock learned that Mr. Mack was a convicted felon. (Tr. at 36-37). He returned to Mr. Mack's vehicle to search the interior again. (*Id.*). Ms. Everett had not yet arrived because she had taken the wrong exit. (Doc. 51-1 at 30-31). During this second search, he found a pistol, a rifle, body armor and ammunition for both weapons. (Tr. at 37-39).

Following the second search, Officer Ruddock told Mr. Mack that a "major issue" had developed, stating: "you're a convicted felon and you've got a firearm on you. And you told me there are no firearms in the vehicle. No. I'm not – I'm not asking you to admit anything. Or say anything." (Doc. 51-1 at 19). When Mr. Mack began to respond, the Officer warned him that it was not in his best interest to speak. (*Id*.). Mr. Mack explained that he didn't know the gun was in his wife's car, insisting that "you didn't ask me that. No, you didn't ask me. I don't carry guns." (*Id.* at 20).

Two APD officers eventually arrived to assist in Mr. Mack's arrest and to await the arrival of Ms. Everett. (Doc. 51-2 at 40-43; 52-54). More than an hour after Mr. Mack was pulled over, Officer Ruddock began transporting him to the Fulton County jail. (Tr. at 43-45). Ms. Everett did not arrive before her husband was removed from the scene.

The evidence seized from the Charger forms the basis of the pending charges. Following his indictment, Mr. Mack filed the pending motion to suppress.

## II.   THE PARTIES' CONTENTIONS

Mr. Mack argues that the warrantless searches were unconstitutional because they were conducted in violation of APD's inventory protocols and without probable cause. (Doc. 51). He submits that because he had been removed from his vehicle and securely detained in Officer Ruddock's squad car before he initiated the searches, they "could not have been justified based on officer safety." (Doc. 51 at 7).

Furthermore, because he had been arrested for driving with a suspended license, there was "no basis for performing a search to find evidence of that crime." (Doc. 51 at 7). The purpose of the Officer's "rummaging," he asserts, "was to find evidence of a crime, and substantiate his hunch that Mr. Mack was carrying firearms and that he was a felon, even though the criminal history of Mr. Mack was not confirmed at the time of the search." (*Id*. at 8-9).

Mr. Mack also contends that Officer Ruddock's claim that he was conducting an inventory search prior to the anticipated impoundment of his vehicle is specious given that he never requested a wrecker service and failed to complete an inventory log pursuant to APD's Standing Operating Procedure 4010. (Doc. 51 at 7-8). Because Officer Ruddock's inventory search was purely "pretextual," he avers, any evidence seized (including statements made during the traffic stop) is inadmissible pursuant to the fruit-of- the-poisonous-tree doctrine. (*Id.* at 11). [1]

The Government maintains that these claims are meritless. First, it submits that

---

[1] In his post-hearing brief, Mr. Mack did not challenge the duration of the traffic stop, nor perfect the claims made in his initial motion to suppress regarding the legality of the traffic stop. Accordingly, these issues are abandoned. See, *United States v. Nazario*, 136 F. App'x 287, 289 (11th Cir. 2005) (finding appellant's failure to raise particular arguments in his initial brief constituted a waiver of those issues) and *United States v. Ardley*, 242 F.3d 989, 990 (11th Cir. 2001).

the warrantless searches did not run afoul of the constitution because Officer Ruddock had probable cause to believe the vehicle contained contraband. (Doc. 52 at 9-13). Pursuant to the automobile exception, warrantless searches are permissible if a vehicle is readily mobile and an officer has probable cause to believe it contains evidence of a crime or contraband. (*Id*. at 7). The Government argues that the fact Mr. Mack possessed an empty gun holster, ammunition, and body armor and appeared to be hiding evidence before he was removed from his vehicle, established that he was likely in possession of a firearm. (*Id*. at 8-11). It also asserts the Officer's early investigation established a "fair probability" that Mr. Mack had been convicted of a felony when he learned he was a "dangerous sex criminal with outstanding warrants." (*Id*. at 11). "The outstanding warrants made it more likely that Mack had a prior criminal history, including a felony conviction." (*Id*. at 11-12). These warrants (coupled with Mr. Mack's furtive behavior following initiation of the traffic stop), it claims, established probable cause to believe the Charger "contained a firearm and ammunition and that the firearm and ammunition were both contraband and evidence of a crime – Mack's unlawful possession." (*Id*. at 13).

Alternatively, the Government argues that the searches were not unlawful because even if no probable cause existed, the inevitable discovery doctrine is applicable. (Doc. 52 at 13-14). Pursuant to this doctrine, evidence seized that "would have been obtained inevitably regardless of any overreaching by police" should not

be suppressed. (Doc. 52 at 13). The Government asserts that prior to initiation of the first search, Officer Ruddock had begun an inquiry into Mr. Mack's criminal history. (*Id*.). Approximately twenty minutes later, he learned Mr. Mack was a convicted felon. (*Id.*). Armed with this information, it continues, the Officer "would have known without question that Mack was a convicted felon and the firearm and ammunition that he knew was in the car was evidence of a crime;" knowledge that justifies application of this exception. (*Id.* at 13-14).

Lastly, the Government submits that the searches were not unconstitutional because they were inventory searches conducted in accordance with APD's policies and protocols. (Doc. 52 at 14-15). These protocols require "every impounded vehicle be inventoried prior to its release to the wrecker service." (*Id*. at 15) (internal citations omitted). Because Officer Ruddock intended to protect Mr. Mack's property and protect himself from potential dangers posed by the vehicle's contents and unfounded allegations of theft, it submits, the searches were conducted in accordance with his Department's standard operating procedures. (*Id.* at 15). Moreover, it emphasizes that Officer Ruddock presumed that the Charger would be impounded because he didn't believe Ms. Everett would arrive before the wrecker service. (*Id.* at 5). The fact that the Charger was never towed is immaterial, the Government claims, because Officer Ruddock "had an obligation to safeguard Mack's possessions, avoid an accusation of theft, and ensure the safety of the other

officer and the community." (Doc. 52 at 16).

In rebuttal, Mr. Mack asserts that his alleged status as a "sex offender" did not establish probable cause that he was a convicted felon. (Doc. 54 at 2). "[T]he mere existence of a warrant would not be [] sufficient basis for concluding [he] was a convicted felon," he argues. (*Id*.). He also submits that the inevitable discovery doctrine is inapplicable in this context since the Supreme Court did not apply that exception in its *Arizona v. Gant*, 556 U.S. 332 (2009) decision; precedent he argues is analogous to his case. (*Id*. at 1).

### III.   LEGAL AUTHORITY AND ANALYSIS

The Fourth Amendment protects against "unreasonable searches and seizures." U.S. Const. amend. IV. A search or seizure conducted without a judicial warrant is considered *per se* unreasonable under the Fourth Amendment. *City of Los Angeles v. Patel*, 576 U.S. 409, 419-420 (2015). "[A] search undertaken without a warrant based upon probable cause generally constitutes a 'per se' Fourth Amendment violation." *United States v. Wilson*, 894 F.2d 1245, 1254 (11th Cir. 1990). Law enforcement officers have probable cause to search a vehicle "when under the totality of the circumstances, there is a fair probability that contraband or evidence of a crime will be found in the vehicle." *United States v. Lindsey*, 482 F.3d 1285, 1293 (11th Cir. 2007) (citation omitted).

The exclusionary rule and the fruit-of-the-poisonous-tree doctrine prohibit introduction of evidence, including verbal statements, obtained as a result of a search or seizure that violates the Fourth Amendment. *Wong Sun v. United States*, 371 U.S. 471, 484–85 (1963); *Marshall v. Sec'y, Fla. Dep't of Corr.*, 828 F.3d 1277, 1288 (11th Cir. 2016). There are exceptions to the Fourth Amendment's warrant requirement, however, including the inventory search exception, the automobile exception, the exception for a search-incident-to-arrest and the inevitable discovery doctrine. *United States v. Scott,* No. 2:24-CR-358-RAH-JTA, 2025 WL 2027445, at *8 (M.D. Ala. May 30, 2025), report and recommendation adopted, No. 2:24-CR-358-RAH, 2025 WL 2024489 (M.D. Ala. July 18, 2025); *Missouri v. McNeely*, 569 U.S. 141, 149-150 (2013). The Government bears the burden of establishing that Mr. Mack's case falls within one of these exceptions and that the search and seizure was reasonable. *United States v. Bachner*, 706 F.2d 1121, 1126 (11th Cir. 1983).

As previously noted, "[I]nventory searches of an arrestee's personal property are a 'well-defined exception' to the warrant requirement." *United States v. Forget*, 853 F. App'x 534, 540 (11th Cir. 2021) (quoting *Colorado v. Bertine*, 479 U.S. 367, 371 (1987)). "[R]easonable police regulations relating to inventory procedures administered in good faith satisfy the Fourth Amendment." *Forget,* 853 F. App'x at 540, (quoting *Bertine*, 479 U.S. at 374). In fact, "[p]olice officers have 'both the right and the duty' to take into custody and inventory a suspect's property that would

12

otherwise be left unattended." *Id.* (quoting *United States v. Staller*, 616 F.2d 1284, 1290 (5th Cir. 1980). An inventory search's purpose is "'to ensure [the detained property] is harmless, to secure valuable items (such as might be kept in a towed car), and to protect against false claims of loss or damage.'" *Id.* (quoting *Whren v. United States*, 517 U.S. 806, 811-812, n.1 (1996)). Importantly, "An inventory search 'must not be a ruse for a general rummaging in order to discover incriminating evidence.'" *Id.* (quoting *Florida v. Wells*, 495 U.S. 1, 4). Instead, "[w]hen officers conduct an inventory [] search, they must base their decision to search a bag or container on 'standardized criteria' or 'established routine.'" *Id.* (quoting *Wells*, 495 U.S. at 3–4). But officers are allowed to exercise their discretion "during an inventory search 'so long as that discretion is exercised according to standard criteria and on the basis of something other than suspicion of evidence of criminal activity.'" *Id.* (quoting *Wells*, 495 U.S. at 3–4). Further, "an otherwise reasonable inventory search is not rendered illegal simply because police officers had a 'suspicion that contraband or other evidence may be found.'" *Id.* (quoting *Staller*, 616 F.2d at 1290).

Under the automobile exception, police are permitted to search a vehicle if the vehicle is readily mobile and probable cause exists to believe the vehicle contains contraband or evidence of a crime. *Maryland v. Dyson*, 527 U.S. 465, 467 (1999); *United States v. Lindsey*, 482 F.3d at 1293; *United States v. Tamari,* 454 F.3d 1259, 1261 (11th Cir. 2006). The "readily mobile" requirement is satisfied if the

13

automobile is operational. *Lindsey*, 482 F.3d at 1293. Ready mobility and probable cause are the "only two questions that must be answered in the affirmative before authorities may conduct a warrantless search of an automobile." *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003). "The legality of a warrantless automobile search is based on the existence of probable cause to believe that the automobile is carrying contraband subject to forfeiture under the law, and the difficulties of securing a moveable vehicle while a warrant is obtained." *United States v. Thomas*, 536 F. Supp. 736, 742 (M.D. Ala. 1982); <u>See also</u> Chambers v. Maroney, 399 U.S. 42, 51-52 (1970); *United States v. Alexander*, 835 F.2d 1406, 1409 (11th Cir. 1988). Probable cause to search exists "'when the facts and circumstances would lead a reasonably prudent [person] to believe that the vehicle contains contraband.'" *Alexander*, 835 F.2d at 1409 (alteration in original) (<u>quoting</u> *United States v. Clark*, 559 F.2d 420, 424 (5th Cir. 1977)). Exigent circumstances exist by the mere potential mobility of the vehicle. *United States v. Nixon*, 918 F.2d 895, 903 (11th Cir. 1990) (the requirement of exigent circumstances is satisfied by the "ready mobility" inherent in all vehicles that reasonably appear to be capable of functioning). "If probable cause justifies the search of a lawfully stopped vehicle, it justifies the search of every part of the vehicle and its contents that may conceal the object of the search." *United States v. Ross*, 456 U.S. 798, 825 (1982). Thus, a warrantless search of an automobile is authorized where probable cause coupled

with exigent circumstances is present. *Thomas*, 536 F. Supp. at 742 (citing *Coolidge v. New Hampshire,* 403 U.S. 443, 458-64 (1970)).

Pursuant to the inevitable discovery exception, evidence is admissible that otherwise would be excludable if it inevitably would have been discovered by lawful means had the illegal conduct not occurred. *Nix v. Williams,* 467 U.S. 431 (1984*).* Absolute certainty is not required, only a showing that it is more likely than not the evidence would have been discovered without the violation. *United States v. Hernandez-Cano*, 808 F.2d 779, 782-783 (11th Cir. 1987); See also, *Nix,* 467 U.S. at 443 n. 4 ("The ultimate or inevitable discovery exception to the exclusionary rule is closely related in purpose to the harmless-error rule of *Chapman v. California,* 386 U.S. 18, 22, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967)."). "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means ... then the deterrence rationale has so little basis that the evidence should be received." *Nix*, 467 U.S. at 443 (footnote omitted). Additionally, it would "put the police in a worse position than they would have been in if no unlawful conduct had transpired," and would "fail[ ] to take into account the enormous societal cost of excluding truth in the search for truth in the administration of justice." *Nix*, 467 U.S. at 445.

The other requirement the Government must meet pursuant to this exception is "that the lawful means which made discovery inevitable were being actively pursued

15

prior to the occurrence of the illegal conduct." *United States v. Johnson*, 777 F.3d 1270, 1274 (11th Cir. 2015)(citing *Jefferson v. Fountain*, 382 F.3d 186, 1296 (11th Cir. 2004). "Active pursuit" in this sense does not "require that police have already planned the particular search that would obtain the evidence" but only "that the police would have discovered the evidence by virtue of ordinary investigations of evidence or leads already in their possession." *Id*. (citations omitted). Finally, the Government must show the exception's applicability "by a preponderance of the evidence" using "demonstrated historical facts." *United States v. Terzado-Madruga*, 897 F.2d 1099, 1114 (11th Cir. 1990) ("[A]s long as it can be shown by 'demonstrated historical facts' that an independent and untainted discovery would inevitably have occurred, the evidence will be admissible.").

> **a. The warrantless searches were not unconstitutional because the "inevitable discovery" doctrine is applicable in this context.**

As noted above, Mr. Mack avers that Officer Ruddock's only basis for arresting him "was because he ran his name through the database, and determined that [his] license was suspended." (Doc. 51 at 6). Once he was securely detained in the Officer's squad car, he asserts that there was no valid basis for performing a search of his vehicle for evidence related to this driving violation. And even though the Officer eventually learned he was a convicted felon – thereby prohibited from possessing a firearm or ammunition – that information had not been obtained before he conducted the first search. This timeline of events, he argues, establishes that both

16

searches were conducted in the absence of probable cause and in violation of APD's inventory protocols.

The Government disagrees, arguing that probable cause existed to justify the initial search based Officer Ruddock's observations of the following: the ammunition displayed by Mr. Mack, the empty holster that usually secures firearms, the bulletproof vests typically used by law enforcement officers for protection from gunfire, Mr. Mack's revelation that he was employed as a fugitive hunter (a dangerous occupation that usually involves firearms), his curious movements suggesting he was attempting to hide evidence, and his removal of the body armor before he stepped out of his vehicle. (Doc 52 at 9-13). These factors, combined with the Officer's knowledge that active warrants involving serious offenses were pending for Mr. Mack's arrest, established probable cause that he was prohibited from possessing a firearm, it argues. (*Id.*). Based on this reasoning, the Government asserts that the automobile exception negates Mr. Mack's constitutional claims.

But even if probable cause was lacking, the Government asserts, the evidence is not subject to suppression because the inevitable discovery doctrine is also applicable under these circumstances. (Doc. 52 at 13). It notes that Officer Ruddock began his inquiry into Mr. Mack's criminal history before he initiated the first search. Within twenty minutes, he was informed Mr. Mack was a convicted felon; information that confirmed he was a prohibited person and could not lawfully

17

possess firearms or ammunition. Because this information was " 'being actively pursued prior to the occurrence of the illegal conduct,'" it clams, the exception is applicable and precludes suppression of the evidence. (Doc. 52 at 13).

The Government's latter argument is persuasive. The record shows Officer Ruddock began searching Mr. Mack's criminal history soon after obtaining his personal information. Less than ten minutes after he initiated the traffic stop, he learned Mr. Mack's driver's license was suspended; a driving violation that mandates arrest and impoundment of a suspect's vehicle if it will be left unattended on a public roadway. Approximately twelve minutes later, the Officer received confirmation that Mr. Mack was a convicted felon. That status prohibits his possession of firearms *and* ammunition, including those observed on Mr. Mack's body armor before either search was conducted. These "demonstrated historical facts" establish that an independent discovery would have inevitably revealed the weapons and ammunition hidden inside the Charger. See, *United States v. Mobley*, 808 F. App'x 899, 902 (11th Cir. 2020)(holding that the inevitable discovery exception applied because the "[e]vidence showed that there was a reasonable probability that the evidence would have been discovered by lawful forfeiture seizure of the Tahoe that the government was actively pursuing before the illegal search.") and *United States v. Johnson*, 777 F.3d 1270, 1274 (11th Cir. 2015)(where the inevitable discovery exception was found to be applicable due to the " 'ordinary

18

investigation into the ownership' of the Impala, the Impala would have been towed and the gun would have been discovered.").

Furthermore, Mr. Mack's reliance on *Gant* is misplaced because the High Court's analysis in that case was based on its finding that the search-incident-to-arrest exception was inapplicable resulting in a Fourth Amendment violation. *Gant*, 556 U.S. at 335 (concluding that past precedent "does not authorize a vehicle search incident to a recent occupant's arrest after the arrestee has been secured and cannot access the interior of the vehicle," and 'also concluding' a vehicle search incident to arrest is justified 'when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle.'")(*Scott*, 2025 WL 2027445, at *11, n. 25, quoting *Gant*). !In the case at bar, the Government does not rely on that exception in defense of the warrantless searches. Consequently, *Gant* is not controlling in this context. Accordingly, the undersigned **RECOMMENDS** that the motion to suppress be **DENIED.**[1]

  b. **Mr. Mack's statements are admissible because they were not obtained as the result of an unlawful search.**

Because this Court finds that the warrantless searches of Mr. Mack's vehicle were not unconstitutional, his claim that his statements should be suppressed as fruit- of-

---

[18] Because the Court finds that the inevitable discovery doctrine is applicable, it will not address the Government's alternative defenses that the automobile and inventory search exceptions also support its argument that the searches were not unconstitutional.

the-poisonous-tree also fails. !*United States v. McElroy*, No. 7:18-CR-398-LSC-TMP, 2019 WL 654354, at *7 (N.D. Ala. Jan. 23, 2019), report and recommendation adopted, No. 7:18-CR-398-LSC-TMP, 2019 WL 764179 (N.D. Ala. Feb. 15, 2019)(where court found that because the warrantless search was not unconstitutional, "[t]he statements made by the defendant were not 'fruit of the poisonous tree' because the tree from which the fruit fell was not poisonous."). Notably, Mr. Mack does not base his challenge to the admissibility of his statements on *Miranda v. Arizona*, 384 U.S. 436 (1966), *Missouri v. Seibert*, 542 U.S. 600, 608 (2004) or its progeny. As a result, this Court will not analyze this claim pursuant to that precedent.

## IV.  CONCLUSION

For all of the reasons presented above, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress Evidence, (Doc. 31), be **DENIED**. Because there are no other pretrial motions pending before the undersigned, Mr. Mack's case is **CERTIFIED READY FOR TRIAL**.

IT IS SO **RECOMMENDED** this 23rd day of December, 2025.

*R. Cannon*
_____
REGINA D. CANNON
United States Magistrate Judge

!